**ATTACHMENT C**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Eastern District of New York (the "Office") and the defendant CENTRAL UNITED TALMUDIC ACADEMY, also known as Keren Habinyan Hachudosh D'Rabeinu Yoel of Satmar BP, Bais Ruchel D'Satmar, Central UTA and CUTA ("CUTA"). CUTA agrees that the following facts and conclusions of law are true and accurate. CUTA admits, accepts and acknowledges that it is responsible for the acts of its officers, directors, employees and agents as set forth below. Should the Office pursue the prosecution that is deferred by the Agreement, CUTA agrees that it will neither contest the admissibility of nor contradict this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charges set forth in the Information attached to this Agreement:

I. **CENTRAL UNITED TALMUDIC ACADEMY**

A. **Operations and Governance**

1. CUTA is a not-for-profit organization based in Williamsburg. CUTA's primary purpose is to operate a yeshiva (i.e., an orthodox Jewish school) (the "School") that serves the Satmar Hasidic community in Williamsburg.

2. The School serves more than 5,000 students, ranging from preschool to secondary school.

3. CUTA currently operates in three different school buildings in Brooklyn located at the following addresses: 762 Wythe Avenue, 84 Sanford Street and 68 Taaffe Place/401 Park Avenue. The boys' school is located at 762 Wythe Avenue and currently serves approximately 2,500 students, while the girls' school is housed in the remaining two buildings

and currently serves approximately 2,800 students. CUTA also operates a building at 575 Bedford Avenue.

4. CUTA employs approximately 700 to 800 teachers and dozens of other staff, including office administration, maintenance, cleaning, food preparation and transportation staff. Day-to-day operation of the School is handled by CUTA's management team, headed by an Executive Director, who reports to the Board of Directors.[1] CUTA's Board of Directors reports to the Oversight Committee, an independent committee comprising professionals appointed by CUTA in response to the government's investigation (described more fully below in Section VI – CUTA's Remedial Measures).

## II. CUTA'S MISCONDUCT

5. As is discussed in greater detail below, CUTA, through certain of its officers and employees, engaged in substantial financial misconduct and operated the School in a manner that violated numerous laws and regulations.

### A. Meal Reimbursement Programs

6. CUTA participated in federally funded meal reimbursement programs since early 2007.[2] These programs included the National School Lunch Program ("NSLP") and the School Breakfast Program ("SBP"), both of which are federally funded by the United States Department of Agriculture ("USDA") and administered in New York by the State Education Department. CUTA continues to participate in these programs.

---

[1] CUTA has replaced its entire senior management team in response to the government's investigation. This includes new individuals in each of the following positions: Executive Director, Controller, Payroll/Human Resources Manager, Food Services Director, Purchaser, and Building Approval Manager.

[2] When participating in federal meal reimbursement programs, CUTA sometimes used another corporation under its control: KHHD Yoel of Satmar BP, Inc.

7. In approximately 2009, CUTA began a supper program through which it served snacks to a portion of its students at approximately 3:30 p.m. and more complete meals to a smaller number of students who participated in after-school programs and remained at the School until the evening. In approximately late 2013, CUTA began to seek federal reimbursement for its supper program through the Child and Adult Care Food Program ("CACFP"), which is funded by USDA and administered by the New York State Department of Health ("NYSDOH").

8. SBP, NSLP and CACFP rules all require, among other things, that children's meals meet various nutritional and caloric requirements. All meals must have specified minimum amounts of fluid milk, fruits, vegetables, whole grains and proteins. These minimum amounts change depending on the specific meal (i.e., breakfast, lunch or supper) and the age of the child. The guidelines also set forth requirements for the ingredients in each component of a reimbursable meal. To be eligible for reimbursement, a student must be served a qualifying meal, not a snack.

9. Through the aforementioned federal meal reimbursement programs, CUTA received money to cover the costs of providing meals to its students. These funds could be applied to the costs of food, supplies and supervision of students by CUTA staff during mealtimes. CUTA received per-meal reimbursement payments each month from the appropriate state agency, based on sworn representations regarding the number of meals that CUTA had served to its students.

10. CUTA participated in the CACFP in 2014 and 2015. The chart below, based on CUTA's internal records and information maintained by the NYSDOH, summarizes the total number of suppers claimed by CUTA per year and the amounts of reimbursement received.

4As described more fully below, the approximately $3.2 million that CUTA received through the CACFP for its supper program was obtained through fraudulent reimbursement claims.

| Year | Total Suppers Claimed | Total Supper Reimbursement |
|---|---|---|
| 2014 | 609,852 | $1,945,905.30 |
| 2015 | 401,824 | $1,310,433.38 |
| **Total** | **1,011,676** | **$3,256,338.68** |

i)      *Misconduct Related to the Supper Program*

11.    The overwhelming majority of meals claimed by CUTA were fictitious. While CUTA did serve food to a small fraction of the claimed recipients, the food that was provided generally did not comply with the nutritional requirements of the CACFP, and thus was not eligible for reimbursement. From 2014 until late 2015, virtually all of the supper claims that CUTA submitted were fraudulent. By submitting false and fraudulent reimbursement requests that did not comply with guidelines and/or by inflating the number of meals actually served, CUTA received approximately $3.2 million more through the CACFP than it was lawfully entitled to receive.

ii)     *Misconduct Related to the Breakfast and Lunch Programs*

12.    Although CUTA did in fact provide subsidized breakfasts and lunches to its students, it lacked procedures and controls to ensure accurate meal counts. Among other things, CUTA employees sought reimbursement based on the number of students in attendance, rather than the number of qualifying meals. In addition, CUTA submitted reimbursement for meals allegedly served on certain days when the School was not in session. These practices, which were self-reported by CUTA, led to CUTA receiving more funds through the SBP and NSLP than it was entitled to receive.

13.     Federal regulations required CUTA's staff to create and maintain production reports detailing the amount of ingredients used to prepare its meals and the number of meals created using those ingredients. CUTA did not regularly create or maintain these production reports.

**B.      Payroll Practices**

14.     As detailed more fully below, from its opening until early 2016, CUTA compensated its employees through several different methods. CUTA paid a portion of compensation in salary, through paychecks in the employee's own name. Federal, state and local taxes were withheld from the paychecks as required. CUTA provided its employees with additional compensation, however, that was omitted from or mischaracterized in CUTA's payroll records and not properly reported to tax authorities. Among other things, CUTA (1) provided a portion of employee compensation in "coupons" (i.e., cash vouchers) that were redeemable at local food vendors, among other vendors; (2) periodically provided paychecks to employee friends or family members despite those individuals not being employed by the School; (3) compensated some employees in cash or by paying their personal expenses directly; (4) abused parsonage designations, which permit the provision of certain compensation to employees who perform ministerial or similar functions for a church, synagogue or similar religious organization; and (5) provided employees with life insurance policies while concealing that the employees would be the beneficiaries of both the policies as well as any investment income generated by the policies.

*i)      Compensation Through Coupons*

15.     From at least 2010 until 2016, CUTA provided many of its employees with "coupons" that could be redeemed by the employees at various local vendors, such as

grocers, butchers, or other stores. A typical coupon was worth approximately one hundred dollars. Employees were typically provided with coupons on a monthly or semimonthly basis. The coupons were treated as cash by vendors in the local Satmar community, who then redeemed the coupons back to CUTA for payment. It was common for CUTA employees to receive a significant portion of their compensation through coupons. From 2010 through 2015, CUTA provided at least 17% of its employee compensation, or more than $12 million, in the form of coupons.

### ii) *Compensation Through No-Show Employment*

16. From at least 2010 until 2016, CUTA compensated certain employees by making salary payments in the names of related individuals who were not actually working at or employed by the School. That is, CUTA paid a portion of the salary to the employee's spouse, relative or friend. This practice permitted employees to receive compensation from CUTA that was not properly reported to tax authorities, and permitted some employees to obtain benefits (or a higher level of benefits) than they otherwise would have been eligible to receive had their full income been properly disclosed.

### iii) *Compensation Through Cash Payments/Bill Payment*

17. CUTA compensated certain employees by paying their personal expenses, including credit card bills. CUTA sometimes provided direct cash payments to its employees in addition to their reported salaries. The decision to provide this type of additional compensation was ad hoc and informal, and depended largely on the needs of the employee. At least 50 to 75 employees were compensated in this manner.

*iv)*     *Providing Parsonage to Ineligible Employees*

18.    Parsonage is a form of compensation available to employees who perform ministerial or similar functions for a church, synagogue or similar religious organization. Parsonage is an allowance granted to eligible employees to cover the expenses of providing and maintaining a home. A parsonage allowance is exempt from the individual's taxable income.

19.    CUTA provides many of its employees with parsonage allowances, which is permissible insofar as the CUTA employees serve as rabbis who provide religious instruction to students. However, from at least 2010 until 2016, CUTA provided parsonage to certain employees who were not eligible to receive it, as those employees did not perform religious functions at the school. Moreover, when paying parsonage to its eligible employees, CUTA did not have controls in place that required the employees to verify the amount of parsonage required to cover the employee's living expenses. At least ten CUTA employees were improperly compensated in this manner.

*v)*     *Life Insurance Policies for Teachers*

20.    CUTA purchased whole life insurance policies for the religious teachers in its schools. Although CUTA was the owner and legal beneficiary of the policies, CUTA held these policies with the discretion to pay the benefits of the policies to the teachers. Teachers were permitted, at certain times, to withdraw funds from the policy accounts or supplement the policy accounts with outside funds. In addition, on several occasions, when teachers ended their employment at the School, CUTA permitted the teachers to take ownership of policies in their names, without requiring any additional payment by the teachers. This practice effectively provided certain teachers with an unreported form of additional compensation.

*vi)*     <u>*Effect of the Payroll Practices*</u>

21.     CUTA's payroll practices permitted CUTA to compensate its employees in a manner that allowed certain employees to avoid reporting a significant portion of their income to the appropriate government authorities.  Of particular significance, these practices enabled employees to receive government benefits that they were not eligible to receive, or to receive a higher level of benefits than they otherwise would have been eligible to receive.

22.     From at least 2010 until approximately 2016, employees of CUTA regularly requested that CUTA provide them with letters confirming their employment status and/or income, and CUTA routinely provided these letters.  CUTA's employees used these letters to support their applications for various government benefits, including Medicaid, public housing, childcare vouchers and nutritional assistance.

23.     The income verification letters provided by CUTA disclosed only the portion of the employees' income that was paid via salary payments made in the employees' names, which was often a fraction of total compensation.  Consequently, the income verification letters provided by CUTA deliberately understated the employees' actual compensation and thus enabled the employees to defraud government programs.

24.     Among the most significant abuses enabled by CUTA's payroll practices was the abuse of childcare vouchers.  The New York City Administration of Children's Services ("ACS") provides childcare vouchers to families who qualify based on income levels.  CUTA's employees, many of whom had households with multiple children, particularly benefitted from the use of these childcare vouchers.  Through its payroll practices and its fraudulent confirmation letters, CUTA enabled both its employees and community members who received no-show jobs

to underreport their income, thereby qualifying for significant childcare allowances for which they otherwise would have been ineligible.

25.     Further, CUTA itself benefited from this fraudulent behavior.  During the relevant time period, CUTA provided both pre-school and after-school programs to community members which were paid for through vouchers provided by ACS.  Numerous employees and community members obtained vouchers through fraudulent representations enabled by CUTA, and in turn used those vouchers to pay CUTA for childcare services.  CUTA thus both facilitated individual acts of fraud and then benefited financially from that fraud.

C.     **E-Rate Program**

26.     From 2006 until the present, CUTA has participated in the federal Schools and Libraries Universal Service Fund Program (the "E-Rate Program"), which is run by the Federal Communications Commission.  The E-Rate Program permits eligible schools and libraries to obtain and install telecommunications and internet-related infrastructure equipment at heavily discounted prices subsidized by the government.

27.     From 2007 to 2015, CUTA sought $13,859,648.52 in E-Rate funding.  Of these requests, CUTA obtained $4,103,826.84 in disbursements.  During this time period, CUTA obtained its E-Rate-eligible goods and services from several vendors that defrauded the E-Rate Program.  For example, during this time period, CUTA's most commonly-used E-Rate Program vendor was Hashomer Alarm, owned by Peretz Klein.  Klein and several others were convicted in 2020 for conspiracy to defraud the E-Rate Program through Hashomer Alarm, among other entities.  CUTA acknowledges that, during the 2007 to 2015 time period, CUTA used the E-Rate Program funds to install technology-related infrastructure or to purchase equipment that was not necessary to serve an educational purpose at the time it was purchased.

28.     From 2016 to the present, under the supervision of a new Executive Director, CUTA sought additional funding from the E-Rate Program.  The company represents that all funds requested since 2016 have been bonafide requests for qualifying educational purposes.

**D.     Unlicensed Childcare Services**

29.     Until 2015, CUTA offered unlicensed childcare services for some of its teachers during the school day.  This service was offered in two classrooms in the building at 84 Sanford Street.  After government inspectors uncovered CUTA's unlicensed childcare services, CUTA was fined by the New York City Department of Health and Mental Hygiene and CUTA subsequently ceased providing such services to its teachers.

**V.     CUTA'S REMEDIAL MEASURES**

30.     In addition to changing its Board of Directors and management, as noted above, CUTA has implemented a series of additional remedial measures to address the aforementioned misconduct and to ensure proper financial operations going forward.  These measures are summarized below.

**A.     Retention of Roth & Company**

31.     In response to the government's investigation, CUTA retained the independent accounting firm Roth & Company to review its operations and develop financial controls to ensure compliance with state and federal law.  Roth & Company's accounting and auditing practices serve a range of not-for-profit institutions, including synagogues, religious schools and social services organizations.

## B.    Designing and Implementing New Policies and Procedures

32.    Roth & Company conducted a review of CUTA's operations and developed a set of policies and procedures (the "Compliance Manual" or "Manual," included as Attachment D).  The goal of the Compliance Manual is to formally implement a "commitment to integrity and ethical values," including through implementation of a rigorous monitoring and enforcement plan.  Compliance Manual, §10.01.  The Manual notes the need to "provide[] all staff with training and technical guidance to help them understand regulatory requirements and the policies [] developed to implement them."  Id. § 10.02.  Department directors are to "attend training to ensure they are fully aware of compliance and financial reporting requirements."  Id. § 10.04.  The Compliance Manual formalizes CUTA's commitment to "plan responses to identified fraud risks," (id. § 10.05), and to "generate[] and use[] relevant, quality information to support the functioning of internal control over financial reporting and to comply with government award program requirements."  Id. § 10.07.  It further requires CUTA's Board and management "to evaluate[] and communicate[] internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the governing Board, as appropriate."  Id. § 10.10.

33.    The Compliance Manual provides specific policies and procedures to police and prevent wrongdoing of the sort described above, including abuses relating meal reimbursements, payroll practices and parsonage.  In addition, the Compliance Manual includes general provisions relating to federally funded programs, potential conflicts of interest, whistleblower complaints, disbursements, registration and tuition, fundraising, vouchers, grant programs, purchasing and accounting.

C.    **Onsite Audits and Follow-Up Testing**

34.    Roth & Company's engagement includes training and onsite testing of CUTA's compliance with the new policies and financial controls.  CUTA will conduct at least one "annual training [] on the importance of compliance with the relevant laws, regulations and grant agreements," plus a "second session [to] include the Oversight Committee's findings, with suggestions for improvement."  Compliance Manual, § 10.02.

35.    The onsite testing will be conducted by Roth & Company and will entail a step- by-step verification of all newly implemented procedures.  Any deficiencies found during the testing will be reported to the Board of Directors and the Oversight Committee (described below).  Together with Roth & Company, those committees will devise a corrective action plan, assigning a responsible individual and appropriate timeframe to remedy any deficiencies.  This process will be repeated until substantial compliance is achieved.

D.    **Creation of Oversight Committee**

36.    To ensure CUTA's compliance going forward, CUTA has implemented an independent Oversight Committee, and Roth & Company has incorporated the Oversight Committee into the Compliance Manual.  See Compliance Manual, §10.01 ("The Board will appoint an Oversight Committee.  At least two members of the committee will be licensed professionals with a background in law or accounting.").

37.    The Oversight Committee has substantial power to ensure compliance at CUTA.  It has access to all of CUTA's staff, as well as its books and records.  Id. ("[The Oversight Committee] will have access to CUTA's books and records, be authorized to hire a professional to examine said books and records and to interview any employee of CUTA.").  It

will meet twice per year and will report its findings to the Board of Directors.  Id.  It is also "authorized to set policy and to revise [the Compliance Manual] as necessary."  Id.

38.     To ensure that any potential whistleblower can report suspected violations of any procedure to an independent body, the Compliance Manual permits such an individual to report directly to the Oversight Committee.  Id. § 12.01 ("For suspected fraud, or when you are not satisfied or uncomfortable with following the Organization's open door policy, individuals may contact the CUTA Oversight Committee directly.  A telephone number for the Oversight Committee is posted in each administrative office.").